ANDREASON et al. v. INDUSTRIAL COMMISSION et al.

No. 6170.   Decided March 13, 1940.   (100 P. 2d 202.)

Rehearing Denied, May 31, 1940.

For opinion on rehearing, see 98 Utah 561.

*Newell G. Daines,* of Logan, for plaintiffs.

*Joseph Chez,* Atty. Gen., *Grover A. Giles,* Asst. Atty. Gen., and *F. A. Trottier,* of Salt Lake City, for defendants.

PRATT, Justice.

Levi M. Andreason was an employee of the Colorado By-Products Company. He died as a result of contracting a disease attributed to Bacillus enteriditis. His widow, Alice N. Andreason, filed an application with the Industrial Commission for compensation for herself and their seven minor

children. The Commission denied her application. She initiated this review.

Andreason's duties at the Company consisted of skinning and butchering animals brought there for use in the manufacture of chicken feed and other animal by-products. He was the only one who performed his duties without the use of gloves. He carried his lunch. Before eating lunch, he washed his hands in cold water without soap. The Company did not furnish soap. Nearly every day a diseased animal was brought in for butchering along with other animals. There were many rats about the place.

Andreason earned $4 per day for seven days a week. He supported his family upon that sum. Their living conditions were rather poor. He ate two meals at home, which with his lunch, were of the same food as eaten by the other members of the family. During the time he could have acquired this disease he had not eaten at any place other than his home and at the Company office, where he ate the lunch he took to work with him. The family enjoyed only occasional meat orders as part of their diet. Their food was purchased at local chain stores. None of the other members of the family suffered any illness from such meat as was eaten, nor from any other food. His lunches were put up for him by his wife or his daughter and usually consisted of sandwiches and coffee—but not any cold meat sandwiches, as he did not like cold meat. When the family had meat it was cooked by them. The testimony is uncertain as to whether they had meat during the period immediately preceding his illness.

The Andreasons did not have a farm or attempt to raise any of their food. They had no chickens, cows, horses, or other animals of husbandry. They used canned milk only. They had a pet dog. There is no evidence that Mr. Andreason came in contact with any diseased animals except at his work. Andreason was not a hunter and did not, during the period in question, go hunting. Their home was free from mice and rats.

The illness that took Andreason's life is uncommon. The medical profession, generally, knows little about it other than it is acquired from contact with diseased animals or diseased meat. One whose hands come in contact with it may carry it to his mouth on his food. It may be carried to him by diseased meat he has eaten or meat that has come in contact with hands of others, who in turn, have contacted diseased animals or meat. Rats or mice coming in contact with his food may give it to him. One person can not contract it from another. The germ will die in ten minutes if exposed to sunlight, but will live for some time in dead animals or in a live body. Cooking meat before eating it will kill the germ if the meat is properly cooked. It takes from 12 hours to 9 days for the infection to affect a person, each case depending upon its circumstances.

Andreason became ill about August 10th or 12th, 1937. He was not a person to complain, and kept at work until and including the 12th. He was taken to the hospital the 16th. His physician treated him for nearly a week at his home before he was taken to the hospital. He died August 23, 1937. There have not been any other known cases of the kind in the State.

We have set out a rather detailed account of the testimony in this case. Those who testified were the physician who attended him, his wife, a fellow employee, another physician with whom the first consulted, and an author and professor in bacteriology and biochemistry from the Utah State Agricultural College. There was no conflict in the testimony. Most of it was expert opinion as to the likely locality of his contraction of the diseased.

Two questions confront us:

(1) Was it an accidental injury?

(2) If so, was it contracted in the course of his employment?

Our statute reads (Revised Statutes of Utah, 1933):

"42-1-43. Compensation for Industrial Accidents to be Paid.

"Every employee mentioned in section 42-1-41 who is injured, and the dependents of every such employee who is killed, by accident arising out of or in the course of his employment, wheresoever such injury occurred, provided the same was not purposely self-inflicted, shall be entitled to receive, and shall be paid, such compensation for loss sustained on account of such injury or death, and such amount for medical, nurse and hospital services and medicines, and, in case of death, such amount of funeral expenses, as is herein provided."

(1) We are of the opinion that under the section of our law quoted, an injury arising out of an accident is not limited in meaning to the result of the application of physical force to the body of the injured. *Tintic Milling Co. et al.* v. *Industrial Commission,* 60 Utah 14, 206 P. 278, 23 A. L. R. 325; *Adams* v. *Industrial Commission,* 95 Utah 507, 82 P. 2d 693; *Young* v. *Salt Lake City,* 97 Utah 123, 90 P. 2d 174; *Industrial Commission of Ohio* v. *Roth et al.,* 98 Ohio St. 34, 120 N. E. 172, 6 A. L. R. 1463; *Peru Plow & Wheel Co.* v. *Ind. Comm. et al.,* 311 Ill. 216, 142 N. E. 546; and *Barron* v. *Texas Employers' Ins. Ass'n,* Tex. Com. App., 36 S. W. 2d 464.

In the case of *Arquin* v. *Industrial Commission,* 349 Ill. 220, 181 N. E. 613, 614, spinal meningitis was held to be an accidental injury and hence compensable. The court said:

"* * * The specific time when the meningitis germ entered the body of the deceased. is, of course, unascertainable, but, since he was in constant contact with this dread disease for six days until he himself was stricken, the evidence seems reasonably sufficient to support a finding that he died as a result of an accidental injury arising out of and in the course of his employment. * * *"

The following is found in *Hood* v. *Maryland Company,* 206 Mass. 223, 92 N. E. 329, 330, 30 L. R. A., N. S., 1192, 138 Am. St. Rep. 379:

"* * * It is plain that Barry suffered bodily injury in consequence of becoming infected with the glanders; as much so as if he had a leg or an arm broken by a kick from a vicious horse. Indeed it is possible that the bodily injury caused by the glanders was greater

and more lasting than that caused by a broken leg or arm would have been. * * *" [Glanders is a highly contagious and very destructive disease of horses, asses, mules, etc., caused by the micro-organism Bacillus mallei. It ends fatally after an acute or chronic course.]

In *Casserly* v. *City of Oakland*, 215 Cal. 600, 12 P. 2d 425, the court held that broncho-pneumonia contracted in the course of employment is an accidental injury:

"* * * The word 'injury' has reference not to some break in some part of the body or some wound thereon, or the like, but rather to consequences or disability that result therefrom. Courts are practically unanimous in holding that the words should be given a broad and liberal construction in order that the humane purpose of the enactment may be realized. Such legislation should be applied fairly and broadly, with a view to confer the benefits intended. * * * 'From the standpoint of pure reason, whether bodily injury which produces a weakening or disintegration of the physical system is caused by flying germs or by flying shrapnel or by poisoned arrow or by the sting of an insect is only a matter of degree as to the size or quality of the missile or instrumentality inflicting the injury.' *Moore* v. *Fidelity & Cas. Co.*, 203 Cal. 465, 471, 265 P. 207, 209, 56 A. L. R. 860."

Webster defines "accidental" as "happening by chance, or unexpectedly," and "accident" as an unexpected event.

In Young v. Salt Lake City, cited above, we distinguish between an accidental injury and an occupational disease. Therein we referred to cases of diseases held accidental injuries which were not the result of an application of physical force to the body. Infection by germs may be an unexpected event, even though not preceded by physical force to the body.

"An accidental injury" might well be expressed as "a disability happening by chance or unexpectedly." It, however, must be connected with the employment. In other words, we do not wish to imply that, because one becomes ill while at work, the statute applies to him, even though it may be that he became ill unexpectedly. That alone is not sufficient to make this case one of an accidental injury. There must be a causal connection between his em-

ployment, or his place of employment, and his illness—something which happened to him in the performance of his duties, or some contact he made at his place of employment while on duty there—which forms the connecting link between his employment and the contraction of the illness. And we might add, which is not an occupational disease as explained in the Young case, supra.

We have not overlooked paragraph 5, section 42-1-42, R. S. U. 1933, which reads as follows:

"The following terms as used in this title shall be construed as follows:

\* \* \*

"(5) 'Personal injury by accident arising out of or in the course of employment' \* \* \* shall not include a disease, except as it shall result from the injury."

In the case of *Pinyon Queen M. Co.* v. *Ind. Comm.*, 59 Utah 402, 410, 204 P. 323, 326, the court, in referring to the case of *Hanson* v. *Dickinson,* 188 Iowa 728, 176 N. W. 823, said:

"\* \* \* The court held that the manifest design of the General Assembly in providing that the term 'personal injuries' should not include a disease was to eliminate occupational diseases. Such obviously was also the purpose of the Legislature of this state [Utah] when disease was excluded in the definition of injury by accident. \* \* \*"

At first glance one might conclude from the statement in section 42-1-42 concerning disease, that, unless infection set in through some wound or abrasion in the skin acquired in the course of one's employment, the resultant disease could not be considered an accidental injury. For example: Assuming that Andreason's illness were contracted by means of germs entering a cut received in his hand while butchering, it would be compensable; but, if he took the germs by means of his food, even though he suffered the cut, the illness would not be compensable. The statement of the illustration is sufficient to show the ab-

surdity of making compensation dependable upon the practically impossible task of proving which of two possible avenues of entry was used by the germs. The common sense interpretation of this statement in paragraph (5) of section 42-1-42, quoted above, is as stated above: That the disease must have a causal connection with the employment and not be merely coincident therewith. *Casserly* v. *City of Oakland,* supra, and *Moore* v. *Fidelity & Casualty Co., of N. Y.,* 203 Cal. 465, 265 P. 207, 209, 56 A. L. R. 860.

(2) Was it contracted in the course of his employment? We have no authority to substitute our opinion of the facts for that of the Commission if reasonable men may differ upon those facts. *Chase* v. *Industrial Comm.,* 81 Utah 141, 17 P. 2d 205; *Russell* v. *Ind. Comm.,* 86 Utah 306, 43 P. 2d 1069; and *Pace et ux.* v. *Ind. Comm.,* 87 Utah 6, 47 P. 2d 1050. There is no conflict of testimony in this case. It is a question of inferences to be drawn from the facts. If there are two or more reasonable and conflicting inferences, we may not interpose our judgment. One does not have to consider the facts nor the statements of the expert witnesses long to conclude that the inferences are strongly in favor of a finding that the disease was contracted at the place of employment—but it is not for us to weigh evidence. What about the inference of a contraction of the disease other than at his place of employment—such as a result of his eating at home, or his home contacts? The trouble with this alternative is that one can not put his finger upon the cause or anything likely to have been a cause. It does not appear that the family had any meat during this period. There were no mice or rats around; there is no testimony concerning the dog or its condition; there was no eating out at restaurants; no other members of the family were ill; there was no epidemic of such disease, such as sometimes occurs in the case of typhoid fever. In other words, we do not see a picture of possible contacts, outside of employment, to which we can point and say: He might have acquired it from that contact, or those contacts.

To illustrate: A typhoid fever epidemic exists. The city water is polluted. Mr. X is a carrier of typhoid. Mr. Y, while working with Mr. X, drinks water from the city system out of Mr. X's cup. From which source—city water or Mr. X—did he acquire typhoid fever? We have two definite sources to which we may point. It is reasonable to believe either one. But in the present case, the contact with possible carriers is all within the employment. The disease is uncommon and rare, it is contracted from contact with diseased animals or diseased meat. Andreason had such contact at the Company plant. It appears affirmatively that he did not have such a contact at any other place. Tested by the rules set out in the case of *Norris* v. *Industrial Comm.*, 90 Utah 256, 61 P. 2d 413, we believe there is only one reasonable inference to be drawn: He contracted the disease in the course of his employment.

We hold that his dependents are entitled to compensation so far as the questions here submitted are concerned.

The order of the Commission is annulled and the cause remanded for further proceedings. Plaintiffs to recover costs.

MOFFAT, C. J., and LARSON, J., concur.

McDONOUGH, Justice (dissenting).

I dissent. While the result reached in the Court's opinion is in accord with the social philosophy underlying Workmen's Compensation Acts, and it would be difficult to assign any reason why the dependants of a workman whose death results from a disease which has a direct causal connection with the employment, should not be partially insured against the pecuniary hardship resulting therefrom to the same extent as the dependents of a workman killed by an explosion or a falling rock; nevertheless, I am of the opinion that the legislature—whose function it is to make provision for such insurance—has not so provided. Clearly as to occupational diseases it has not. *Pinyon Queen M. Co.* v. *Ind.*

*Comm.,* 59 Utah 402, 204 P. 323. And the reasons which argue for the inclusion within the provisions of the Act of a disease arising out of the employment, other than an "occupational" disease, are equally compelling as to the latter.

Under paragraph 5, Section 42-1-42, R. S. U. 1933, quoted in the opinion of the court, I am of the opinion that the legislature has specifically excluded the plaintiffs in this case from the benefits of the Act. Such paragraph states that " 'personal injury by accident arising out of or in the course of employment' * * * shall not include a disease, except as it shall result from the injury." Note that it does not say "except as it shall result from an accident." There must be a causal connection not only between the disease and the employment, but between the disease and "the injury." If the disease be the injury, it is difficult to see how it could be also the "result" of the injury. In seeking—pursuant to the statute—the cause of the result, we find that to be the result itself. The wording of the statute clearly expresses to the writer the thought that before a disease shall be included within the meaning of the quoted paragraph, two factors must concur: (1) An injury; and (2) a disease. And the latter must be the result of the former. A disease which causes injury—and all diseases do—though it may be considered as accidental, is not alone sufficient. *Tintic Milling Co.* v. *Industrial Commission,* 60 Utah 14, 206 P. 278, 23 A. L. R. 325; *Adams* v. *Industrial Commission,* 95 Utah 507, 82 P. 2d 693, are not contrary. In fact, they support the contention here advanced. In each case there was an injury *and* a disease.

The quoted provision of our statute is not a part of the law in those jurisdictions from which excerpts are quoted in the court's opinion. The writer concedes that "accidental bodily injury" might properly be construed to include disease—absent a legislative definition excluding it. In *Hood* v. *Maryland Co.,* 206 Mass. 223, 92 N. E. 329, 30 L. R. A., N. S., 1192, 138 Am. St. Rep. 379 (cited in the opinion of the court), an insurance policy was so construed. Yet the

decisions of the Massachusetts court, in construing its Workmen's Compensation Act, are apparently in harmony with the conclusion of the writer as to disease being excluded therefrom, except as such disease results from an injury. See *Minns' Case*, 286 Mass. 459, 190 N. E. 843 (and cases cited therein).

WOLFE, Justice (dissenting).

I concur in the views expressed by Mr. Justice McDONOUGH in his dissenting opinion.