**PITTSBURGH TESTING LABORATORY and Liberty Mutual Insurance Company, Plaintiffs,**

v.

**Marion B. KELLER, Widow of Sylvan R. Keller, Deceased, and the Industrial Commission of Utah, Defendants.**

**No. 17756.**

Supreme Court of Utah.

Jan. 28, 1983.

---

Richard H. Moffat, John L. Young, Salt Lake City, for plaintiffs.

Ralph R. Tate, Jr., David L. Wilkinson, Salt Lake City, for defendants.

## REPLACEMENT OPINION

DURHAM, Justice:

Pittsburgh Testing Laboratory and Liberty Mutual Insurance Company (plaintiffs) have filed this writ of review to set aside an order of the Industrial Commission which awarded Marion B. Keller, widow of Sylvan R. Keller, workmen's compensation death benefits. The order directed the plaintiffs to pay Marion Keller $52,104 plus medical expenses in accordance with the statutory fee schedule, and the statutory funeral allowance of $1,000. Plaintiffs seek reversal of that order or, in the alternative, an apportionment of the benefits to be paid to Mrs. Keller between the plaintiffs and the "second injury fund." See U.C.A., 1953, § 35–1–68, (1979 Supp.).

Sylvan Keller was employed by Pittsburgh Testing Laboratory as a structural steel inspector. At the direction of his employer, Mr. Keller made an inspection tour of the Weber College Special Events Center on August 29, 1978. He was accompanied by Mr. Hamp, an employee of Weber College, who testified before the administrative law judge concerning his and Mr. Keller's activities during the inspection.

During the morning, they performed a visual inspection of the structures immediately above the arena floor. In the afternoon, they moved up to the top level of the Special Events Center. They were able to walk in an area 3–5 feet in height which was immediately below the outer roof. They were required to crawl through a series of wooden A-frames, the tops of which were

attached to the roof and the bottoms of which supported the structure upon which they walked. The building is basically round and they entered on one side and began to move in a circle around the perimeter. Mr. Hamp estimated that the inside temperature was 20–40° above the outside temperature, placing it in a range of 100–125°. He described the area in which they moved as very warm and extremely stuffy. He said that they occasionally stopped at small openings in the structure in order to get a breath of fresh air. After two hours in this area, Mr. Hamp testified, their clothes were "wringing wet" and they were slowing down just to catch their breath. Mr. Keller experienced particular difficulty in breathing and stopped at a point where he found some fresh air leaking into the rafter space. Mr. Hamp moved on in a futile effort to find another exit, and by the time he finally concluded that they could only exit the way they had come in, Mr. Keller was physically unable to travel that distance. Paramedics were called and they cut a hole in the ceiling in order to remove Mr. Keller, who at that point had been in the enclosed area for nearly three hours. Oxygen was administered to Mr. Keller and, after resting in one of the offices of the Special Events Center, he drove himself back to Salt Lake City. He had complained to Mr. Hamp of being hot, tired, weak and short of breath, but had not complained of any particular pain.

Mrs. Keller testified that over the next three days Mr. Keller exhibited exhaustion, was unable to engage in any activity and frequently requested cold drinks. She found him sitting up in bed the morning of September 2 experiencing severe chest pains and took him to Holy Cross Hospital. In the medical history provided by Mr. Keller to a doctor at Holy Cross Hospital, he stated that he had experienced chest pains while in the attic of the Special Events Center but had no nitroglycerin with which to relieve it. He also stated that in the three days that followed, the pain occurred 10–15 times a day and was precipitated by progressively less exertion. During this time, he had not mentioned any pain to his wife.

In 1965, Mr. Keller had experienced an anterior myocardial infarction followed by exertional angina. He was hospitalized in Hawaii in 1973 for a suspected acute myocardial infarction and after that he experienced stable angina pectoris 1–3 times a day which was relieved by nitroglycerine. Upon his admission to Holy Cross Hospital in September of 1978, he was diagnosed as having an acute interior wall myocardial infarction. Further testing revealed severe coronary artery disease of long-standing which was treated three weeks later by extensive coronary bypass surgery and removal of a ventricular aneurysm. Mr. Keller's recovery from the surgery was incomplete and he was later diagnosed to be suffering from pulmonary disease and gallbladder disease, which resulted in continuing hospitalization. After experiencing progressively more severe congestive heart failure, plus pump failure and kidney failure, he developed bacteriemia and died in September of 1979.

A hearing was held before the administrative law judge at which Mr. Hamp and Mrs. Keller testified, and Mr. Keller's medical records were introduced into evidence. The matter was then referred to a medical panel. See U.C.A., 1953, § 35–1–77 (1979 Supp.). The medical panel's report did not link Keller's heart attack of September 2, 1978, with the stress he had experienced in the ceiling of the Special Events Center four days earlier. Mrs. Keller objected to the findings of the medical panel and introduced the testimony of Dr. Frank Yanowitz, Chief of Cardiology, LDS Hospital in Salt Lake City. Dr. Yanowitz testified that the stress experienced in the ceiling of the Special Events Center affected Mr. Keller's heart and this subsequently led to the heart attack which he experienced 3–4 days later. After reviewing the evidence, including the testimony and opinions of the medical panel and Dr. Yanowitz, the administrative law

judge made the following order on February 10, 1981:

> The Administrative Law Judge adopts the findings of Dr. Frank Yanowitz as his own and finds that the decedent's death on September 22, 1979, was directly related to the events at the Dee's Special Events Center on August 29, 1978, results of which produced a coronary insufficiency which eventually led to the deceased's myocardial infarction on September 2, 1978, and ultimately resulted in his death on September 22, 1979.

On appeal to the Industrial Commission, the order of the administrative law judge was affirmed and the plaintiffs filed this writ of review.

██ We have recently had the opportunity to review the many authorities which define the scope of review in Industrial Commission cases and we have reaffirmed the limitations on this Court's inquiry:

> [The reviewing court's inquiry is] whether the Commissions' findings are "arbitrary and capricious," or "wholly without cause" or contrary to the "one [inevitable] conclusion from the evidence" or without "any substantial evidence" to support them. Only then should the Commission's findings be displaced.

*Sabo's Electronic Service v. Sabo,* Utah, 642 P.2d 722, 725 (1982) (quoting *Kaiser Steel*

*Corp. v. Monfredi,* Utah, 631 P.2d 888, 890 (1981)). In order to award compensation, the Commission must determine that an accident has occurred and that there is a causal connection between the accident and the injury claimed. It is the second step in this determination which is called into question by the plaintiffs in this case.[1] Our comment in *Sabo,* concerning a back injury, is equally applicable to the questions generated by Mr. Keller's heart disease:[2]

> The accident must result in an injury which is causally related to the work being done. The mere showing of injury does not *ipso facto* mean that a compensable accident has occurred.

*Sabo, supra,* at 725. We also noted in *Sabo* that "[i]n difficult cases, the findings of a medical panel may assist in determining whether the injury was caused by an accident . . . ." *Id.* at 725. The findings of the medical panel, however, are not determinative. "Essentially, they are reporters of the medical aspects of a given case in aid of the Commission's appraisal and weighing of all the facts." *Redman Warehousing Corp. v. Industrial Commission,* 22 Utah 2d 398, 402, 454 P.2d 283, 285 (1969). *See also Sabo, supra; IGA Food Fair, supra* note 1.

██ In the case at bar, the Commission had before it conflicting medical testimony. The medical panel reported the following findings to the administrative law judge:

1. The plaintiffs repeatedly emphasize the lack of a causal link between the "incident" at the Special Events Center and Mr. Keller's heart attack four days later. Thus, they claim there was no "compensable accident," without specifically analyzing whether the "incident" meets the threshold test of an accident. In *Powers v. Industrial Commission,* 19 Utah 2d 140, 427 P.2d 740 (1967), a case involving a preexisting heart condition, we said: "The law is well settled that the aggravation or lighting up of a pre-existing disease by an industrial accident is compensable and that an internal failure brought about by exertion in the course of employment may be an accident within the meaning of the act." *Id.* at 143, 427 P.2d at 743. *See also IGA Food Fair v. Martin,* Utah, 584 P.2d 828 (1978). This is consistent with our recent discussion of the meaning of the term "accident" in *Sabo's Electronic Service v. Sabo,* Utah, 642 P.2d 722 (1982), a back injury case, where we said: "It [the term accidental]

simply means that the effort exerted, considering the position in which the workman was put by the work being done at the instant of the injury, was such that an injury, unanticipated and unforeseen, resulted to the workman." *Id.* at 726 (quoting *Continental Baking v. Industrial Commission,* 92 Utah 438, 69 P.2d 268 (1937)).

2. We have previously affirmed the Commission when it has awarded benefits where the claimant suffered from a preexisting heart condition which was aggravated by an employment-related accident. *See IGA Food Fair, supra* note 1; *Nuzum v. Roosendahl Construction and Mining Corp.,* Utah, 565 P.2d 1144 (1977). *See also Powers v. Industrial Commission, supra* note 1, where we reversed the Commission where it failed to award benefits to a claimant with a preexisting heart condition.

2. As a reasonable medical probability, the stress experienced by Mr. Keller in the Weber College Special Events Center, was in a nature of heat exhaustion without symptoms that were clearly cardiac in nature. Therefore, the panel believes that the experience was at most a minor stress event and not a substantial contributing cause of the interior wall myocardial infarction suffered by Mr. Keller on September 2, 1978.

3. As a reasonable medical probability, the stress experienced by Mr. Keller on August 29, 1978 was not a substantial contributing factor to the need of a triple bypass surgery on September 21, 1978. In fact, the longstanding and progressive atherosclerotic disease of the coronary arteries was the cause of the myocardial infarction leading to the triple bypass surgery.

Dr. Yanowitz, the cardiologist called by Mrs. Keller, testified that there was in fact a causal link between the stress event at the Special Events Center and the heart attack which occurred 4 days later. His findings are summarized in a letter sent to Mrs. Keller's attorney and entered into the record:

The chest pain symptoms lasting one hour while in the rafters of the Special Events Center and relieved by oxygen administration is by virtue of its duration not angina pectoris but coronary insufficiency, a more serious chest pain syndrome in coronary diseases and one which is likely to be a prodrome or precipitating factor preceding a myocardial infarction. The majority of acute myocardial infarction have a several day prodrome of increasing pain symptoms preceding the actual infarction. From all the information you provided me, I am of the opinion that the events of August 29, 1978 precipitated these symptoms which, in turn, led to his myocardial infarction.

In the testimony before the administrative law judge, a member of the medical panel stated that its conclusions were in part based upon Mr. Keller's failure to complain of any chest pain to Mr. Hamp while in the Special Events Center and his subsequent failure to complain of any chest pain to his wife. The doctor testified that he considered the comment concerning chest pain to the receiving resident at Holy Cross Hospital on September 2 as "self-serving." On cross-examination, the doctor testified that the single primary factor the panel relied upon in not linking the stressful event in the Special Events Center to the onset of the heart attack was a lack of significant pain on August 29 or the subsequent three days.

Dr. Yanowitz testified that he based his findings on the pain which Mr. Keller experienced on August 29 and the repeated episodes of pain with increasing severity Mr. Keller experienced in the four-day interim before his heart attack. Dr. Yanowitz testified that he thought the reports of Mr. Keller to the resident at Holy Cross Hospital upon his admission were reliable. He also relied on Mrs. Keller's testimony that Mr. Keller did not report the pain to her because he did not want to worry her since she had recently experienced some heart trouble. He found this to be a credible reason for Mr. Keller not reporting the pain to his wife during the three days following the incident at Weber College, particularly in light of the fact that he did not even report the incident itself to his wife during that period. The medical panel and Dr. Yanowitz stated in their written reports and in testimony before the administrative law judge that Mr. Keller's death was due to the September 3, 1978, heart attack and subsequent deterioration of his coronary arteries, and not the surgery or its complications.

In view of the competent and comprehensive medical evidence in the record upon which the Commission relied in arriving at its conclusions, despite the contrary findings of the medical panel, we conclude that the Commission's finding that there was a causal connection between Mr. Keller's dis-

tress in the Special Events Center and his subsequent heart attack four days later is neither "arbitrary or capricious" nor "without any substantial evidence to support it." The Commission's order that Mrs. Keller is entitled to dependent's death benefits is therefore affirmed.

Plaintiffs also claim that the Commission erred in refusing to apportion the benefits awarded to Mrs. Keller between the employer and the Second Injury Fund. It appears from the record that, despite plaintiffs' inclusion of the Industrial Commission in the caption of its brief, neither the Commission nor the Second Injury Fund has been made a party to this appeal. The issue of apportionment was apparently presented to the Commission during the hearing stage of these proceedings, but not addressed by it. The issue of apportionment is therefore not properly before us. The order of the Commission respecting that issue is vacated and the matter is remanded for further proceedings deemed appropriate by the Commission in light of this opinion. No costs awarded.

HALL, C.J., and STEWART, OAKS and HOWE, JJ., concur.